IN THE COURT OF UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Sustainable Meats LLC | ) | CASE NO. |
| through Statutory Agent | ) | |
| Alexander McCoy | ) | |
| 20601 S Pleasant Valley Rd. | ) | |
| Kuna, ID 83634 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| Griffon Holdings LLC | ) | |
| c/o Its Statutory Agent | ) | **JURY TRIAL DEMAND** |
| James A. Amodio | ) | |
| 109 W. Liberty Street | ) | |
| Medina, OH 44256 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Griffon Systems LLC | ) | |
| c/o Its Statutory Agent | ) | |
| Foth nd Foth Co LPA | ) | |
| 11221 Pearl Road, Suite 5 | ) | |
| Strongsville, OH 44136 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Griffon Farms LLC | ) | |
| c/o Its Statutory Agent | ) | |
| Foth And Foth Co LPA | ) | |
| 11221 Pearl Road, Suite 5 | ) | |
| Strongsville, OH 44136 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Hernando Posada | ) | |
| 4927 Rays Circle NW | ) | |
| Dublin, OH 43016 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Arthur Pusch | ) | |
| 17451 Shurmer Road | ) | |
| Strongsville, OH 44136 | ) | |

and                                                     )
                                                        )
Jane or John Doe                                        )
Owner of Griffon Holdings LLC                           )
c/o Its Statutory Agent                                 )
James A. Amodio                                         )
109 W. Liberty Street                                   )
Medina, OH 44256                                        )
                                                        )
and                                                     )
                                                        )
Jane or John Doe                                        )
Owner of Griffon Systems LLC                            )
c/o Its Statutory Agent                                 )
Foth and Foth Co LPA                                    )
11221 Pearl Road, Suite 5                               )
Strongsville, OH 44136                                  )
                                                        )
and                                                     )
                                                        )
Jane or John Doe                                        )
Owner of Griffon Farms LLC                              )
c/o Its Statutory Agent                                 )
Foth and Foth Co LPA                                    )
11221 Pearl Road, Suite 5                               )
Strongsville, OH 44136                                  )
                                                        )
and                                                     )
                                                        )
Dirigo Food Safety LLC                                  )
c/o Its Statutory Agent                                 )
Michele Pfannestiel                                     )
18038 Heritage Trail                                    )
Strongsville, Ohio 44136                                )
                                                        )
and                                                     )
                                                        )
Michelle Pfannenstiel                                   )
18038 Heritage Trail                                    )
Strongsville, Ohio 44136                                )
                                                        )
                                                        )
                    Defendants.                         )
                                                        )
                                                        )

2

Plaintiff Sustainable Meats LLC ("Sustainable Meats" or "Plaintiff"), for its Complaint against Griffon Holdings LLC ("Griffon Holdings"), Defendants Griffon Systems LLC ("Griffon Systems"), Griffon Farms LLC ("Griffon Farms"), Hernando Posada ("Posada"), Arthur Pusch ("Pusch"), Dirigo Food Safety, LLC ("Dirigo"), and Michelle Pfannenstiel ("Pfannenstiel") (collectively "Defendants"), states as follows:

## INTRODUCTORY STATEMENT

1.      Defendants contracted with Plaintiff on October 9, 2020, to fabricate and deliver modular food processing units and provide sustainable meat processing practices and consultation services in exchange for a total contract price of $899,860.48 with $337,430.00 due upfront at signing.

2.      Even though Defendants estimated delivery for the modular food processing units at twelve weeks, Defendants strung along Plaintiff from October 2020 to January 2022, repeatedly alleging they were working tirelessly to construct the modular food processing units while running into "supply chain" and "operational issues."

3.      Defendants' excuses became increasingly elaborate over the 15 months, including Defendants claiming the modular food processing units were fabricated and ready to ship to Plaintiff but that their shipping trailers were stolen and they needed to engage the police to locate them.

4.      It turns out, Defendants defrauded Plaintiffs and never fabricated the modular food processing units; instead, Defendants used Plaintiff's $337,430.00 to operate other functions of Defendants' various businesses.

5.      Plaintiff informed Defendants of their breach and its desire to cancel the contract and demanded full repayment of the $337,430.00 deposit.

6.      In lieu of returning the $337,430.00, Plaintiff and Defendants entered a settlement agreement on December 5, 2022 for Defendants to provide certain equipment and cash payments totaling $75,000 to Plaintiff.

7.      Defendants once again failed to perform and breached the settlement agreement and did not produce the equipment described in the settlement agreement nor the cash payment.

8.      Due to Defendants' misrepresentations, Plaintiff lost thousands of customers, over One Million Dollars in sales, thousands of work hours, and costs to replace Defendants' services, which resulted in significant losses, not to mention reputational damage.

9.      With this lawsuit, Plaintiff seeks, among other things: (a) to hold Defendants to account for their breach of their contractual obligations, and (b) to recover losses it sustained when Defendants fraudulently induced it into providing a $337,430.00 cash deposit to fabricate and deliver modular food processing units and provide sustainable meat processing practices and consultation.

## **PARTIES**

10.     Plaintiff Sustainable Meats is an Idaho limited liability company with its principal place of business at 20601 S Pleasant Valley Rd., Kuna, Idaho 83634.

11.     Plaintiff runs an organic and custom processing slaughter operation committed to humane animal handling and sustainable practices.

12.     Defendant Griffon Holdings is an Ohio limited liability company registered to do business in Ohio with its principal place of business at 4927 Rays Circle NW, Dublin, Ohio 43016.

4

13.     Griffon Holdings, at all relevant times stated in the Complaint, conducted business in the manufacturing of food processing systems at 5280 Avon Lake Road, Litchfield, Ohio 44253.

14.     Defendant Griffon Systems is an Ohio limited liability company, which registered to do business in Ohio on September 9, 2020, with its principal place of business at 5280 Avon Lake Road, Litchfield, Ohio 44253.

15.     Defendant Griffon Systems, at all relevant times stated in the Complaint, conducted business in the manufacturing of food processing systems at 5280 Avon Lake Road, Litchfield, Ohio 44253.

16.     Defendant Griffon Farms is an Ohio limited liability company, which registered to do business in Ohio on September 9, 2020, with its principal place of business at 11221 Pearl Road, Suite 5, Strongsville, Ohio 44136.

17.     Defendant Griffon Farms, at all relevant times stated in the Complaint, conducted business in the manufacturing of food processing systems at 5280 Avon Lake Road, Litchfield, Ohio 44253.

18.     Defendant Posada is an individual residing at 4927 Rays Circle NW, Dublin, Ohio 43016 who is a beneficial owner of Griffon Systems, Griffon Farms, and Griffon Holdings and serves in the capacity of President and Chief Executive Officer ("CEO") of Griffon Systems and Griffon Holdings.

19.     Defendant Pusch is an individual residing at 17451 Shurmer Road, Strongsville, Ohio 44136 who is a beneficial owner of Griffon Systems, Griffon Farms, and Griffon Holdings and serves in the capacity of Chief Operating Officer ("COO") of Griffon Systems and Griffon Holdings.

20.    At the time the contract was executed, Defendant Dirigo was a limited liability company registered to do business in the state of Maine; however, Dirigo subsequently registered to do business in the state of Ohio on August 20, 2021 and merged the Maine limited liability company into the Ohio limited liability company on September 8, 2021.

21.    Dirigo's is a food safety consulting business with a principal place of business at 18038 Heritage Trail, Strongsville, Ohio 44136.

22.    Defendant Pfannenstiel is an individual residing at 18038 Heritage Trail, Strongsville, Ohio 44136.

23.    Pfannenstiel, the President and CEO of Dirigo, is a veterinarian, business coach, and food safety strategist who created "Food Safety University, a game changing course for simplifying food safety planning for small business operators."[1]

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S. Code §1332(a)(3) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

25.    This Court has personal jurisdiction over Griffon Holdings because Griffon Holdings is an Ohio limited liability company.

26.    This Court has personal jurisdiction over Griffon Systems because Griffon Systems is an Ohio limited liability company.

27.    This Court has personal jurisdiction over Griffon Farms because Griffon Farms is an Ohio limited liability company.

---

[1] https://www.dirigofoodsafety.com/

28. This Court has personal jurisdiction over Posada because Posada is a resident of Ohio.

29. This Court has personal jurisdiction over Pusch because Pusch is a resident of Ohio.

30. This Court has personal jurisdiction over Dirigo because Dirigo is an Ohio limited liability company.

31. This Court has personal jurisdiction over Pfannenstiel because Pfannenstiel is a resident of Ohio.

32. Venue is proper in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred within this district as a result of Griffon Systems', Griffon Holdings', and Griffon Farms' development of food processing systems in Lichfield, Medina County, Ohio and Dirigo's consulting agreement requires suit to be filed in "State and Federal court of Cuyahoga County, OH" per Section 12.

33. Venue is proper in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 1391(b)(3) because at least one of Defendants is subject to personal jurisdiction in this Court with respect to the causes of action at issue in this Complaint.

## GENERAL ALLEGATIONS

**A. Pfannenstiel pitched Sustainable Meats with Her Innovative Modular Slaughter System, The Locker, and Warranted Her Fabricator Griffon Systems Could Produce and deliver The Locker in Approximately Twelve Weeks.**

34. The first mobile processing units (MPU) came about in the mid-1990s, but Pfannenstiel, a veterinarian and U.S. Army trained food safety expert, created a prototype MPU called "The Locker" in the mid-2010s that promised to solve highly stringent regulatory issues and

allow smaller operations to compete with the larger operations that could fund and operate their own large, expensive brick and mortar slaughterhouses.

35.     In January 2017, Pfannenstiel through Dirigo, introduced what is considered a "plug and play" shipping container meat processing system called The Locker that consists of multiple shipping container modules configured as needed for the customer that could include an office, bathroom, carcass preparation area, carcass chill and raw fabrications modules, and separate dry and raw finished product storage areas.[2]

 

36.     According to Pfannenstiel, The Locker "allows farmers to produce retail cuts and value-added products, such as bacon, sausage and charcuterie that drastically can increase profit potential and market demand. 'There's this blank in the market when you outgrow what your local processing plant can do and before you go to co-packing….The Locker allows people to come in at a price point that is an order of magnitude lower than building.'"[3] "Sustainable meat — made in a box?" published by Lynne Curry on April 19, 2017.

37.     Pfannenstiel represented in her May 1, 2018 LinkedIn article titled "Dirigo Food Safety's Locker named finalist in MITC New Product Global Showcase" that "The Locker is an

---

[2] This image appears on Dirigo's Facebook page advertising The Locker.
[3] https://www.greenbiz.com/article/sustainable-meat-made-box

economic, efficient, cleanable and inspectable space to do small scale value added production without the large overhead costs associated with brick and mortar infrastructure.  It comes fully assembled in a reconditioned 40'x8' refrigerated container that needs only access to potable water, electricity, and sewage. It is designed with efficiency and Global Food Safety initiative (GFS) food safety guidelines in mind and comes with three months of consulting from Dirigo Food Safety."[4]

38.    At its inception, Pfannenstiel's prototype of The Locker was so highly regarded, she represented it was named one of six finalists in The Maine International Trade Center's New Product Global Showcase in 2018; however, internet links to the Locker on Dirigo's website no longer work.

39.    In addition to Pfannenstiel's qualifications, she represented LinkedIn article that Dirigo is a "full-service food safety consulting group…that specializes in [Hazard Analysis Critical Control Point (HACCP) and Safe Quality Food (SQF)] compliance food safety training, crisis management, and scalable systems consulting" that strives "to help businesses grow, comply with regulations, and inspire consumer trust."

40.    The U.S. Food and Drug Administration's HACCP is a management system that is "an effective and rational means of assuring food safety from harvest to consumption" through a seven-step process to develop a HACCP Plan to pass an audit to ensure customers receive safe food.[5]

41.    When Plaintiff learned about The Locker and Pfannenstiel's purported expertise, Mark Coates, a Plaintiff Program Manager, emailed Pfannenstiel in and around June 2020 and

---

[4] https://www.linkedin.com/pulse/dirigo-food-safetys-locker-named-finalist-mitc-new-pfannenstiel/
[5] https://www.fda.gov/food/hazard-analysis-critical-control-point-haccp/haccp-principles-application-guidelines#execsum

received The Locker specifications sheet (the "Spec Sheet").  A true and accurate copy of the Spec Sheet is attached as Exhibit A.

42.　　The Spec Sheet advertised The Locker could withstand transport and that it would be manufactured under the "quality control" of Dirigo:

> The containers specified herein are manufactured under the quality control of Dirigo Food Safety.
>
> The container is designed and manufactured for the carriage of general cargo by marine, road, and rail. It is designed to maintain its structural and weathertight integrity within a temperature range of -30 ºC to 80 ºC.
>
> The container will be constructed to be handled under the following conditions without distortion or effect on its structural integrity:
>
> > A. Lifting full by its top corner castings by means of spreaders
> >
> > B. Lifting full by its bottom corner castings by means of casting at a sling angle of 30 degrees
>
> The container will be constructed to be suitable for transportation in normal operating conditions by modes of:
>
> > A. Marine - on deck or in cell guided by vertical or diagonal lashings
> >
> > B. Rail - on flat or container car secured at its bottom corner castings
> >
> > C. Road - on flat or chassis secured at its bottom corner castings

43.　　Plaintiff and Pfannenstiel held a conference call to discuss Plaintiff's specific needs and potential layouts to customize The Locker system.

44.　　As a follow up to that call, on or about August 17, 2020, Pfannenstiel emailed Plaintiff a quote for consulting services and production of The Locker with basic drawing schematics and introduced Plaintiff to Dirigo's fabricator, Griffon Systems, via email (the "Initial Quote"). A true and accurate copy of the Initial Quote is attached as Exhibit B.

45.     On or about August 21, 2020, Dirigo, Pfannenstiel, Alex McCoy ("McCoy"), Plaintiff's Managing Member, and members of Griffon Holdings discussed via video conference the Initial quote and supporting documents prepared by Dirigo to induce Plaintiff to enter into a contract with Defendants to purchase The Locker and receive consulting services.

46.     Between August 22 to 25, 2020, Defendants held more phone conversations to hammer out the details of a potential contract and payment terms for fabrication and delivery of The Locker and consulting services.

47.     After a series of inquiries from McCoy to get a better understanding of pricing and specific dimensions, Posada, Pusch, and Pfannenstiel required McCoy to sign a non-disclosure agreement—Posada signed on behalf of Griffon Holdings and McCoy signed on behalf of The American Ostrich Company, LLC (the "NDA"), the parent company of Plaintiff, of which McCoy is the CEO.

48.     On or about August 25, 2020, Pfannenstiel delivered an updated quote for The Locker system customized for Plaintiff's purposes (the "Updated Quote") that included the following modules that made up the entire system to be delivered: an office, bathroom, carcass preparation area, carcass chill and raw fabrications modules, and separate dry and raw finished product storage areas (collectively, "The Locker System"). A true and accurate copy of the Updated Quote is attached as Exhibit C.

49.     The individual modules making up The Locker System consisted of modules that were either 8 feet tall ("Single Tall Module") or 16 feet tall ("Double Tall Module").

50.     On or about August 28, 2020, McCoy provided a marked-up version of the Updated Quote with questions regarding pricing, specific dimensions, and suggested modifications, but Pfannenstiel refused to provide some requested information because a contract was not signed.

51.     McCoy expressed frustration because they executed the NDA for the purpose of sharing proprietary information and reiterated he needed the requested information to evaluate The Locker against another vendor as he needed a system operational by the end of the year to fulfill customers' orders.

52.     While these discussions were on going, and upon information and belief, Posada, and Pusch registered Griffon Farms as a limited liability company with the State of Ohio on or about Wednesday September 2, 2020 to operate the property located at 5280 Avon Lake Rd. Lichfield, Ohio (the "Farm"), where Defendants alleged they would fabricate The Locker.

53.     A few days later on or about Wednesday September 9, 2020, Posada and Pusch formed and registered Griffon Systems as a limited liability company with the State of Ohio, upon information and belief, specifically for this transaction.

**B. Griffon Systems, Dirigo, and Plaintiff Entered a Contract for Defendants to Fabricate Pfannenstiel's Design and For Her to Consult in the Production of The Locker and Sustainable Meat Processing Practices.**

54.     On or about October 5, 2020, Griffon Holdings delivered documents for Plaintiff to contract with Griffon Systems, namely, Griffon Systems' terms and conditions, an invoice summary, a cover letter outlining the estimated deliver date for The Locker, wire instructions, and site completion letter, which was the result of the aforementioned discussions among Plaintiff and Defendants.

55.     On or about October 6, 2020, after receipt of the contract offer from Griffon Holdings, McCoy emailed Posada seeking clarification on the place of shipment, assignment of contract rights, timeline for delivery, specifications, and adding pass throughs to the invoice.

56.     The next day, Posada responded the fabrication, delivery, and installation of the Locker would occur in approximately six weeks, but McCoy questioned the "6-week minimum"

timing because the Cover Letter accompanying the Transaction Documents says 12 weeks—McCoy specifically asserted: "The speed is really important for us [because] we have animals waiting to be processed...[thanks]!"

57.     Posada assured McCoy that same day "we expect the window to be six weeks best case and ten weeks worst case."

58.     While negotiations continued, upon information and belief, Griffon Holdings purchased the Farm on October 6, 2020, for $1,380,000 to serve as the fabrication location for The Locker.

59.     Around this time as well, Posada, Pusch, and Pfannenstiel conducted a video call from the Farm to give McCoy a virtual tour of the facility to induce him to execute the contract because of the location's purported capabilities; however, Plaintiffs later learned Griffon Holdings purchased the property to operate a farm and hold festivals, such as the "Griffon Farms Fall Fest" on October 22, 2022 per its website and Facebook page.

60.     On or about October 9, 2020, Griffon Systems entered into a contract with Plaintiff under which it was obligated to fabricate, deliver, and install several modular food processing units that make up The Locker System in exchange for a total payment of $899,860.48 from Plaintiff (the "Agreement"). A true and accurate copy of the Agreement is attached as Exhibit D.

61.     Under the Limitation of Liability Section 11 (a)

> (a) IN NO EVENT SHALL SELLER BE LIABLE TO BUYER OR ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR DIMINUTION IN VALUE, OR FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE AND WHETHER OR NOT SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES,

AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR  OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

(b) IN NO EVENT SHALL SELLER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL AMOUNT PAID TO SELLER FOR THE GOODS SOLD HEREUNDER.

(c) The limitation of liability set forth in Section 12(b) above shall not apply to (i) liability resulting from Seller's gross negligence or willful misconduct and (ii) death or bodily injury resulting from Seller's acts or omissions.

62.     Included with the Agreement was an invoice summary (the "Invoice Summary") dated October 7, 2020 outlining the specific deliverables as follows (a true and accurate copy of the Invoice Summary is attached as Exhibit E[6]):

| Item | |
|---|---|
| Double decker Griffon slaughter system | |
| Double Carcass chill unit/ cold storage | |
| Raw Production unit (portioning and packaging with Rolls Stock) | |
| 40ft finished product storage cooler/freezer | |
| Office Bathroom/Offal | |
| Consulting | included |
| Shipping | TBD |
| System assembly | included |
| Site improvements, including electric, water, sewer, surface & roadwork | |
| Composting machine | |
| Product tracking & labelling system | |
| Total | $899,860.48 |

63.     The cover letter delivering the Agreement set forth a twelve-week timeline for the fabrication, delivery, and installation of The Locker System, which would be an estimated completion date of January 1, 2021 (the "Cover Letter"). A true and accurate copy of the Cover Letter is attached as Exhibit F.

---

[6] Plaintiff filed a Motion to Seal Ex. E, so in an abundance of caution, Plaintiff redacted the Defendants' confidential, pricing information contained in this screenshot.

64.     The Agreement required Plaintiff to wire a deposit totaling $337,430.00 to a bank account belonging to Posada and Griffon Holdings on the execution date (the "Deposit").

65.     Plaintiff paid the Deposit in full on October 9, 2020.

66.     Contemporaneously with entering the Agreement, Plaintiff and Dirigo entered into a Consulting Agreement on October 9, 2020 under which Dirigo was a subcontractor to Griffon Systems to provide consulting services and a membership to Food Safety University for twelve months, which included, but was not limited to, instruction related to the operation and use of The Locker and a food safety plan review (the "Consulting Agreement"). A true and accurate copy of the Consulting Agreement is attached as Exhibit G.

67.     Under Section 3(A) of the Consulting Agreement and the Invoice Summary, the fees for Dirigo and Pfannenstiel's consulting services were included in the $899,860.48 purchase price.

68.     Further under Plaintiff, Dirigo, and Pfannenstiel agreed to the following Limitation of Liability Section 8(E) of the Consulting Agreement:

> EXCEPT WITH RESPECT TO CLAIMS ARISING FROM THE FRAUD, INTENTIONAL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY, IN NO EVENT SHALL EITHER PARTY, ITS OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS, BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST PROFITS, LOSS OF BUSINESS, LOSS OR CORRUPTION OF DATA OR LOSS OF GOODWILL, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR SERVICES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT WITH RESPECT TO THIRD PARTY CLAIMS ARISING (A) FROM THE FRAUD, INTENTIONAL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY, (B) A CLAIM FOR WHICH INDEMNIFICATION IS PROVIDED HEREUNDER, OR (C) FROM THE BREACH BY A PARTY OF ITS OBLIGATIONS UNDER SECTION 6 OF THIS AGREEMENT, EACH PARTY'S

TOTAL AGGREGATE LIABILITY TO THE OTHER PARTY FOR CLAIMS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT EXCEED THE AMOUNT OF FEES ACTUALLY PAID BY CLIENT TO DFS IN THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE UPON WHICH THE CLAIM AROSE. EXCEPT AS NOTED ABOVE, THE LIMITATION OF LIABILITY SET FORTH IN THIS SECTION 8(E) SHALL APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER THE ASSERTED LIABILITY OR DAMAGES ARE BASED ON CONTRACT (INCLUDING, WITHOUT LIMITATION, BREACH OF WARRANTY), INDEMNIFICATION, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), STATUTE OR ANY OTHER LEGAL OR EQUITABLE THEORY.

69.     The statement of work attached as Exhibit A to the Consulting Agreement outlined the following deliverables for Dirigo and Pfannenstiel ("Statement of Work"):

a.  Certification in Meat and Poultry HACCP and/or Preventive Controls for Human Food and/or Certification in Preventive Controls for Animal Foods;

b.  Weekly recurring Group coaching sessions facilitated by the Dirigo Food Safety Team over Zoom or similar platform;

c.  Feedback on work provided by the Dirigo Food Safety Team, when delivered in accordance with the feedback system created and communicated by the Dirigo Food Safety Team;

d.  Access to learning materials on topics related to the Food Safety Systems Model on the platform;

e.  One weeklong onsite meeting to review facilities and process implementation at startup;

f.  One weeklong onsite meeting to review facilities and process implementation at the occurrence of the Food Safety Assessment (FSA) by U.S. Department of Agriculture (USDA) personnel;

g.  Calls as needed with regulatory personnel;

h.  Emergency access to Dr. Pfannenstiel, not to exceed 3 hours a month; and

i.  Hazards-based food safety plan(s) and 90-day pathogen control validation plan(s) as they pertain to specific processes occurring in the facility.

70.     Per the Statement of Work, it was "strongly suggested that [Plaintiff] allocate at least 50% of one mid-level employee's working hours to the attentive monitoring [and] review of FSS tasks in low-complexity systems…."

**C. Griffon Systems Allegedly Begin Fabricating the Locker at the Farm and Pfannenstiel and Dirigo Begin Performance.**

71.     After execution of the Agreement and Consulting Agreement and remittance of payment by Plaintiff, Defendants warranted they began fabricating The Locker System and, upon information and belief, Pfannenstiel and Dirigo received payment for their services from Griffon Holdings.

72.     Plaintiff subsequently dedicated three staff members, including McCoy, to train with Pfannenstiel and Dirigo.

73.     Pfannenstiel stepped away from the fabrication process at this point and focused on training Plaintiff's staff even though it was her design and she was supposed to oversee the manufacturing process per the Spec Sheet and verbal representations.

74.     Of the duties outlined in Section (a) of the Consulting Agreement, Dirigo and Pfannenstiel did not perform the following:

j.  One weeklong onsite meeting to review facilities and process implementation at startup;

k.  One weeklong onsite meeting to review facilities and process implementation at the occurrence of the FSA by USDA personnel;

17

l.   Calls as needed with regulatory personnel; and

m.  Emergency access to Dr. Pfannenstiel, not to exceed 3 hours a month.

75.    Furthermore, Dirigo and Pfannenstiel did not provide one deliverable as outlined in Section (b) of the Consulting Agreement, which resulted in Plaintiff hiring a USDA trained professional, Jessica Foreman ("Foreman"), in November 2020 to produce the needed documentation that Dirigo and Pfannenstiel failed to produce.

76.    During that same time period, McCoy and Posada exchanged numerous text messages where McCoy repeatedly inquired as to the fabrication plans and the delivery and installation of The Locker System for the purpose of regulatory and permitting approval, including requesting updates on the installation plans, facility design, and permit applications (collectively, the "Plans").

77.    Around this time, McCoy learned from Griffon Systems that it did not have an Idaho licensed engineer on staff even though they previously represented they did.

78.    On November 30, 2020, McCoy recommended to Posada that they employ Idaho structural engineer Jimmy Church ("Church") of Leavitt & Associates Engineering, Inc. to assist in completing the Plans to ensure Plaintiff would be able to operate The Locker System in Idaho when it arrived.

79.    Plaintiff's last substantial communication with Dirigo and Pfannenstiel was before January 2021 when she and her staff stopped responding to emails and phone calls from Plaintiff, which was less than three months into their twelve-month contract.

80.    On or about January 27, 2021, McCoy and Defendants held a teleconference during which Posada promised McCoy would receive the necessary Plans for the fabrication, installation, and delivery of The Locker System by January 29, 2021.

18

81.     On or about February 4, 2021, McCoy texted Posada asking for an update regarding the Plans, which were not delivered as promised.

82.     McCoy sent Posada follow up text messages asking for an update on the Plans and a call to discuss the status on or about February 9th and 23rd and March 10th.

83.     On or about March 16, 2021, Plaintiff's USDA trained employee Foreman invited scheduled a video conference entitled "Discuss facility arrival timeline and final building plans", for Monday March 22, 2021 and invited Foreman, McCoy, Pfannenstiel, Andrew Pfannenstiel of Dirigo, David Zarling of Dirigo, Pusch, Posada, and Brian McCoy of Plaintiff Sustainable Meats.

84.     Pusch called Foreman on March 19th to confirm he would be in attendance:

85.     Between March 16, 2021 and March 22, 2021, none of the Dirigo participants replied to the invited, and at the last minute, Pusch called Foreman to cancel the video conference stating, "I'm hopping on a plane to Atlanta…there was no steel in Alabama…we could have conferences all we want but if I can't find steel we are up shits creek."

86.     It was at this point that Pusch became dismissive and verbally abusive toward Foreman, and McCoy took over all communications from Plaintiff's side.

87.     This cancelling of the scheduled video conference precipitated a strongly worded email from McCoy to Pusch demanding answers to many basic questions about the project status that Defendants had continued to refuse to answer.

88.     McCoy and Pusch talked via phone on March 26, 2021, during which Pusch revised the delivery timeline and represented the following to be statements of fact:

    a. The system is currently 65% built and the architectural drawings sent for approval within two to three days.

b.  Pusch will review requirements for Idaho Modular Building Approval previously emailed by Lisa Stover of Plaintiff and will determine the fastest way to obtain building approval.

c.  On or before March 29, 2021, Griffon Systems will deliver a complete, full set of engineered plans to McCoy and Church for obtaining the Idaho Licensed Engineering stamp of approval.

d.  On or before March 29, 2021, steel will be confirmed as ready to ship to the Farm.

e.  On or before April 7, 2021, all steel will arrive at the Farm, which is the last component of what is required to complete The Locker System.

f.  On or before April 21, 2021, The Locker System will be completed and shipped from Ohio to Idaho.

g.  On or before the week of April 26, 2021, The Locker System will arrive in Idaho and be assembled onsite in Idaho.

h.  On or before May 3, 2021, The Locker System will be ready to commence full operation.

89.  On April 12, 2021, in another recorded phone call, McCoy inquired about a project update, and Pusch stated,

the sheet metal is a little bent, but we could make it work," and they would ask the supplier "for another batch [to] put your stuff together this week.  We're under the units right now trying to see if these things will straighten out with a little heat on them and if they do, then the insulation with take and we'll go from there.  In about four or five hours we should know…right now I'm inclined to say yes, it will work….we worked all weekend….You're not the only project we're backed up on.  This is our livelihood; this is what we do….I was on the phone with the steel supplier three hours ago and they are trying to truck some up so we have it by tomorrow night.

90.     McCoy responded, "that's great they will be able to send that steel up so fast" to which Pusch replied, "well, that's because I gave them a lot of money in advance."

91.     On or about April 30, 2021, McCoy texted Posada for an update on the Plans, namely the Mechanical, Electrical, Plumbing (MEP) Plans for the HVAC system because he had not heard from Pusch in a while.

92.     McCoy sent follow up text messages on or about May 6, 7, 10, and 12, 2021 again requesting an update on the Plans.

93.     McCoy did not hear back from Pusch until May 12, 2021, with only "They're coming – promise."

94.     On or about May 13, 2021, McCoy sent a follow-up text message to Pusch to send "whatever" Plans currently exist by the end of the day and for a detailed schedule of the final construction and delivery of The Locker System.

95.     Pusch responded that day he will send a final timeline when he gets confirmation on what material are available and will send the drawings when he receives them.

96.     Pusch did not send the Plans until May 17, 2021, nearly seven months behind schedule.

97.     Plaintiff reviewed the Plans and realized there were major issues, including basic misspellings and typos, and began to doubt Griffon Systems' ability to complete this project let alone produce The Locker System and the Plans to a standard that would be approved to operate in the state of Idaho.

98.     On or about May 20, 2021, McCoy sent Pusch detailed observations about the Plans and offered to work directly with the engineer, Church, to speed up the process.

99.     On or about May 28, 2021, McCoy had not received any feedback, so he messaged Pusch for an update on the corrected Plans, the material availability, and the shipment timeline.

100.    On that day, Pusch responded they were trying to get material as they currently only had about sixty percent of the needed material, he confirmed he signed off on the Plans and they will be sent soon, and the timeline will be updated pending the efficacy of the material.

101.    On or about June 2, 2021, Pusch, upon inquiry, confirmed there were updated Plans, so McCoy informed Pusch that he did not have them.

102.    Throughout June, McCoy repeatedly messaged Pusch asking three things: 1) to be connected with the persons working on the updated Plans to help move the process forward because Plaintiff cannot move forward with obtaining permits to operate The Locker System without the Plans, 2) whether Church had reviewed the Plans, and 3) a timetable for the construction of The Locker System  and whether July 10, 2021 was still the target ship date—Pusch did not respond.

103.    On July 1, 2021, Pusch told McCoy "the material is just coming off the back of the trucks," and McCoy inquired "are we still on track to finish by [July 10th]?"

104.    Pusch responded "if I have the material, yeah, I can easily finish it….I got the plans – playing a little phone tag with Church and I'll get you copied on what I send him over next" and "actually, I have a call with him in about 15 minutes."

105.    On or about July 7, 2021, McCoy texted Pusch inquiring whether they were still on schedule to ship by the end week and whether any progress had been made on the Plans with Church.

106.    On the same day, Pusch responded that they were in the "midst of finishing units 24 hours a day, we had no July 4th holiday. I am back on yours tomorrow."

107.    During this time period and throughout, Pusch claimed his team was working on projects for the Federal Emergency Management Agency (FEMA) that delayed their progress.

108.    Plaintiffs also repeatedly asked to visit the Farm and monitor the fabrication process, but Pusch always denied those because of the alleged security protocols in place because they were allegedly fabricating products for FEMA and the Department of Defense (DOD).

109.    On or about July 7, 2021, McCoy responded, "It's July 7 and the last update I got said my units would be on a truck heading west no later than July 10. Is that no longer the case?"

110.    Pusch responded the July 10th schedule still works "if all the material [received] is correct and workable" and that he would provide an update on July 8th.

111.    On or about July 8 and 9, 2021, McCoy messaged Pusch for an update and phone call, but Pusch did not respond.

112.    On or about July 10, 2021, McCoy and Defendant Pusch held a call to discuss the status of Griffon Systems' performance where Pusch stated:

> This past Thursday we had a little accident while we were dry fitting your top…your second story onto the main story [of the Double Tall Modules]…the coupler bar that provides the torsional strength that holds the two units together…the ones that they had sent me crumbled so we had to pull it off and fix it.  I have two of your units on trailers but they're parked in the barn because of huge rainstorms and they can't get wet.  I have them wrapped but I still don't want to risk getting them wet.  As soon as I fix the problem of putting it on I will give you a delivery time.  We're working today and I just had a few minutes to call you.  In the whole accident with the torsional thing my phone got wrecked so my wife got me a new one this morning….[I go through] about 7 phones a year….we're having a 130pm meeting today with the logistics transport unit and the replacement material guy so I can finish everything up and send the units your way.

113.    On July 12, 2021, Pusch relayed in a phone call with McCoy that "we're having a problem with the steel coupling and I'll give you an update in the morning but I have it ready to

23

go….I have a call with Mr. Church in the morning for two more pieces of information and I'll send you an email with a copy of it in the afternoon."

114.    On or about July 16, 2021, after more than six months during which Posada and Pusch represented numerous times that they "had gotten Church all the information he needs [to gain approval to operate The Locker System in Idaho]," McCoy received an email from Church informing him "I haven't heard from [Pusch] recently, unless I missed a message.  We are not doing anything on your project at this time."

115.    Upon information and belief, Griffon Systems never formally engaged Church, and Church never did any paid work for Griffon Systems to assist with the engineering of The Locker System despite the numerous claims by Posada and Pusch to the contrary.

116.    On or about July 16, 2021, Pusch informed McCoy that "I have not followed up because we have been too busy with construction and logistics" and that he will address obtaining the Plans once construction and logistics are squared away.

117.    Pusch also noted, "we upgraded your sanitary ability regarding the bathroom."

118.    On or about July 16, 20, and 22, 2021, McCoy asked Pusch how many modules were now ready for shipment, for an expected shipment date, and whether Pusch connected with Church on the Plans, but Pusch did not respond.

119.    Pusch responded on or about July 22, 2021 he was pulling "things" together to send the Plans to Church.

120.    On or about July 24, 2021, McCoy asked Pusch for a progress update on the Plans with Church and noted he was not copied on an email to Church regarding the Plans, as Pusch promised.

121.    On or about July 27, 2021, McCoy again asked Pusch for updates and availability for a call.

122.    On that same day, Pusch responded that Church requires a great deal of information for the Plans that Pusch alleges is outside the scope of the Agreement, the Goods are stronger than shipping containers and the only complaint about them is that the material is tough to drill or penetrate through, and they have encountered issues with two units with the weight of the top of the unit and the newer steel supports holding the top correctly when the top is placed over the bottom.

123.    On or about July 27, 2021, McCoy expressed his frustration to Pusch because without permits The Locker System are worthless if they cannot be operated legally.

124.    McCoy offered to help with obtaining permits and completing the permitting Plans, while reiterating Pusch needs copy him on emails to Church.

125.    McCoy also further inquired whether the final Plans were sent to Church as the last Plans that McCoy received were from June 10th, after which Pusch assured McCoy the draftsmen would turn them around quickly in agreement with McCoy's comments on the Plans.

126.    Lastly, McCoy asked for the prognosis on the coupling issue, when Pusch anticipates it will be resolved, and for a timetable for shipment, but he did not receive an answer.

127.    McCoy sent follow up text messages on August 5, 13, and 19 asking for a status update on the coupling issue, the Plans and permitting approval, and a new shipping date.

128.    After no response, McCoy requested a phone call on or about August 26, 2021 to which Pusch responded, "Hospital."

129.    After multiple attempts to reach him, Pusch's wife informed McCoy Pusch was allegedly hospitalized with COVID and unable to speak on September 7, 2021.

130.     On or about September 17, 2021, Pusch texted McCoy he is in the middle of the logistics to send the completed modules of The Locker System and that the modules require a specific type of bed for shipment.

131.     On or about September 21, 2021, McCoy asked Pusch for a video of the crane load/upload to send to some local operators for advice on the specific type of beds for The Locker System units, but Pusch informed McCoy he already obtained a bed for shipment.

132.     On that day, McCoy asked for the timing of shipment and arrival of the units.

133.     The next day, McCoy sent a follow up message asking for a progress update on the shipping logistics for the completed units and offering to connect Pusch with truck drivers if he was having issues finding ones.

134.     Pusch assured McCoy procuring drivers was a non-issue, but the rain needs to stop before shipment can proceed.

135.     On or about September 23, 2021, McCoy asked Pusch for an update on the timing of shipment and arrival in Idaho, and Pusch relayed he was having difficulty assembling the modules without having the top pieces dry fitted so they could verify the functionality of the overhead trolley, electrical, plumbing, and HVAC.

136.     Pusch further stated that once these verifications occur, the modules will be wrapped and loaded for shipment.

137.     McCoy asked whether those issues can be verified after shipment to avoid multiple checks, but Pusch said no because their standard operating procedure requires the modules are checked three times before shipping.

138.    McCoy expressed a concern he would not have enough time to schedule an evaluation with the State of Idaho for permitting purposes, but Pusch assured McCoy he will have enough time.

139.    On or about September 28, 2021, McCoy asked Pusch for an update on The Locker System function verification and loading to which Pusch responded the next day they were working on making a workable exoskeleton to facilitate assembling the modules for verifying functionality.

140.    On or about September 29, 2021, McCoy asked whether Pusch could send the modules that are ready now, namely the three Single Tall Module.

141.    On or about October 1, 2021, Pusch responded to McCoy that "Nothing leaves until it works."

142.    Throughout October of 2021, McCoy repeatedly asked for updates and whether the Single Tall Modules could be shipped, but Pusch said no because of the exoskeleton issue and assured McCoy they were trying every viable option.

143.    By late October, Pusch shifted the blame to a lack of available shipping trailers to ship the three Single Tall Module and assured McCoy he will load the trailers when they arrive, and that they are simultaneously working on verifying the functionality of the other completed modules.

144.    On or about October 29, 2021, Pusch informed McCoy the trailers were supposed to arrive last week but claimed they were still on their way to his location from Savanah, Georgia.

145.    On or about November 9, 2021, Pusch alleged that two of the trailers were stolen by a logistics company, one was found in New York harbor and the other is down the coast, possibly in New Jersey, while the third should be back in Ohio.

146.    Pusch claimed he was in New York City doing paperwork with the port authority and New York City Police Department to retrieve one trailer out of port while looking for another trailer.

147.    McCoy demanded Pusch ship one Single Tall Module immediately on the trailer that was in Ohio and arrange for a third-party hauler to transport the other two.

148.    On November 16, 2021, Pusch called McCoy to report:

> One of our trailers got destroyed and one of our units got tipped over…it's just a single unit… it's not one of yours – it's one of our [other customer's].   One of my trailers in New York got destroyed…one of our other units got put onto one of our trailers and for some reason it just fell over on its side….I'm not guna point fingers but it stinks and that's why we had health inspectors out to look at everything that happened.  That took until about 7 o'clock last night.  I have one trailer that it's on its way back and I'll have [one of your Single Tall Module] ready to go on that and one of our staff is trying to locate another low boy trailer so I can get at least two of your units [shipped out to Idaho].

149.    McCoy inquired about the whereabouts of Pusch's other trailers he represented he had, to which the following exchange occurred:

> Pusch:    I have three trailers, only one that's coming back.
>
> McCoy:    I thought you told me you had one that arrived [back in Ohio] last weekend?
>
> Pusch:    Yeah, but I had to use that to deliver other [modules]…I'm playing catch-up…I'm playing catch up, bud – that's what I'm doing.
>
> McCoy:    [Pusch], we're a year out here – aren't you prioritizing our trailers, here?
>
> Pusch:    I'm prioritizing your trailers and everybody else's….you're not the only one that's been delayed by all this…you're the only one that's got the behemoth systems right now and I can't move the behemoth systems.  I'm trying to get this done in the

next 24-48 hours. Believe me, I don't want to sit on these things.

McCoy:    So you think you can ship at least one of [our modules] in the next 24 hours?

Pusch:    Yes, within the next 48 hours…I'll need a crane [in Idaho] on Monday.

150.    On November 18, 2021, McCoy and Pusch had a contentious phone call during which McCoy asked for another update on when the trailers would leave Ohio, and Pusch responded with a barrage of profanities, but without any material updates to when the trailers would be sent other than "within 24 hours."

151.    On or about November 23, 2021, Pusch claimed he worked until 3:00 a.m. the previous night and started again that morning at 8:00 a.m. to resolve manufacturing problems, which contradicts his earlier statements the Single Tall Module were ready to ship.

152.    McCoy continued to ask for updates on the shipment of the Single Tall Modules but received no response until on or about November 30, 2021, when Pusch claimed his phone had been "smashed," so he could not respond.

153.    Pusch claimed he contacted two steel engineers for insight on issues that arise when cranes lift the modules to load them on the trailers.

154.    On or about November 30, 2021, McCoy asked Pusch whether the plan was still to ready the Single Tall Modules for travel to Idaho and requested a video to help McCoy understand the issues.

155.    Throughout December 2021, McCoy repeatedly asked for updates and pictures and videos of the modules so he could assess the issues, but no videos or pictures were sent, and Pusch repeatedly confirmed the Single Tall Modules would ship soon.

156.     On or about December 10, 2021, McCoy remarked that he may need to make alternative decisions if Pusch is unable to perform under the Agreement, and requested an update on the structural issues and whether Defendants will ship the modules.

157.     On or about January 5, 2022, McCoy emailed Pusch requesting he ship the three Single Tall Modules as is and an update on the two Double Tall Modules he had not received an update in quite some time.

158.     McCoy further requested videos of the Single and Double Tall Modules so he can gauge the state of construction and prepare for any structural issues that they will have to deal with when the modules arrive in Idaho.

159.     On or about January 7, 2022, Pusch's wife alleged he and his team have COVID again, and Pusch is quarantined until Friday evening.

160.     On or about January 14, 2022, Pusch messaged McCoy that he and his crew were allegedly hospitalized for COVID and that he will review everything and provide an update.

161.     McCoy sent follow up text messages to Pusch on January 19, 20, 21, and 24 asking for the three Single Tall Modules to be shipped as is, for updates on shipment and videos of the modules to assess the structural issues, and about the McCoy cancelling the Agreement and Griffon Systems returning Plaintiff's Deposit.

**D. Plaintiff Provided Notice of Breach of the Agreement and Demanded Return of the Deposit for Non-Performance.**

162.     On or about January 26, 2022, McCoy emailed a notice of the issues and delays associated with Griffon Systems' performance, or lack thereof, under the Agreement and informed Griffon Systems that if they do not provide video evidence of all completed modules and a statement of intent to commence with shipment of the three Single Tall Module within seven days

by January 27, 2022, Plaintiff will obtain replacement goods from another supplier and declare a breach of the Agreement.

163.    McCoy also indicated, in the alternative, Pusch could promptly return the Deposit to avoid a breach of contract lawsuit.

164.    On or about January 27, 2022, Pusch agreed to resolve the issues by returning the Deposit or sending the modules as is, but he requested until January 31, 2022 to provide a final engineering evaluation and plan for resolution.

165.    On or about January 31, 2022, McCoy asked Pusch for an update on the final engineering evaluation and plan for resolution, and Pusch claimed he was waiting for the engineering group to finalize its analysis so he could understand whether the Single Tall Modules can be shipped.

166.    Pusch further stated that he hoped to receive this analysis by the end of the day or the following morning and assured McCoy that resolving these issues immediately was a priority.

**E. Defendant Informed Plaintiff They Cannot Fabricate The Locker System as Warranted and Cannot Return the Deposit.**

167.    On or about February 2, 2022, McCoy and Pusch held a phone call in which Pusch informed McCoy Griffon Systems cannot deliver The Locker System as warranted and guaranteed he would refund the Deposit in "two tranches" over the course of thirty-three (33) days.

168.    The same day McCoy memorialized his phone call with Pusch and their agreement to cancel the Agreement in exchange for the return of the Deposit in full to Plaintiff in the next 33 days.

169.    On or about February 16, 2022, McCoy emailed Pusch for a status update on when the Deposit will be wired, and Pusch responded, "we are literally in the midst of making the arrangements.  I will reach out to you soon as we are ready to transfer."

170.    On or about April 5, 2022, Griffon Systems had not refunded the Deposit, but Pusch assured McCoy in a phone call that he was currently driving to the bank to sign the documents for the loan to repay the Deposit and needed to get there before they closed in 20 minutes at 6:00 p.m.

171.    From that point on through June of 2022, Pusch and Posada continued to stall and deceive Plaintiff regarding the status of the Deposit refund—at one-point, Posada took over coordinating issuing the Deposit refund and Pusch used that to imply that this caused further delay.

172.    In a phone call on June 14, 2022, Posada informed McCoy they could not refund the Deposit, listing a litany of excuses that contradicted Pusch's prior statements, and alleging they were assessing how to avoid filing bankruptcy while at the same time assuring McCoy that Griffon Systems wanted to do right by Plaintiff, stating that "all our assets are built into the materials and equipment and machinery and everything else that goes into building these units…and so, that's where our liquidity is."

173.    McCoy reminded Posada of an earlier conversation with Pusch where Pusch represented he was on the way to the bank to sign the loan paperwork to which Posada responded, "we have been in discussion with the lenders to try to leverage the assets or sell them outright to be able to get liquidity but at this point the banks are very hesitant knowing our cashflow situation to give us loans."

174.    The conversation continued:

> McCoy:    All the stuff you have has got to be worth enough money to get the cash.
>
> Posada:   Oh yeah, that's the only saving grace here, that the price of everything we have has skyrocketed – equipment, I mean band saws, equipment for the units, windows for the units, all that stuff is now worth almost three times since we bought it….and in addition to that, we have three of our smaller units still in inventory….I have people who want to buy them but they can't get

the financing to purchase them.  The question becomes what do I do with them – I can't sell them to somebody who can't finance them….at this point I haven't liquidated anything because I want to talk to my board and the attorneys to figure out the best way to handle you."

175.    Later in the conversation Posada contradicts his earlier statement that he currently has three modules: "I have two mobile units that I still have – the rest of them are all sold – but there's two quote-un-quote mobile units that I still have and have never been used…and then I have all the equipment that goes into the big ones and the small ones."

176.    Posada further offered "three never before used Generac generators" in lieu returning the Deposit in cash, to which McCoy suggests Plaintiff is open to the idea and needs to see a list of proposed equipment with value paid.

177.    Posada agreed to provide such a list.

**F.  Griffon Systems and Plaintiff Enter the Settlement Agreement Where Griffon Systems was Required to Transfer Certain Equipment and Deliver a Cash Payment of $75,000 to Plaintiff in Exchange For a Release of All Claims.**

178.    On or about June 26, 2022, Posada delivered a memorandum to McCoy stating that it has become illiquid due to the increase in raw materials costs and delays in receiving raw materials and proposed returning the Deposit in the form of equipment detailed in a list attached to the memorandum.

179.    On or about July 1, 2022, McCoy responded that the equipment referenced in the memorandum was insufficient to extinguish Plaintiff's claim for the Deposit.

180.    McCoy countered that if they included three brand new Generac generators, three Single Tall Module two mobile units, and all equipment that goes into Double Tall Modules that Griffon Systems was unable to use because they did not complete fabricating The Locker System, that this additional equipment, in addition to the equipment listed in the memorandum, is

33

approximately equal to the Deposit value owed and would suffice in place of refunding the Deposit (the "Equipment").

181.    McCoy also asked what happened to the proceeds from the sale of Plaintiff's Double Tall Modules that Pusch claimed were fabricated and sold to another customer—the proceeds were to be applied to the return of the Deposit.

182.    Subsequent to the claim that the modules were sold to another buyer that had less rigorous specification requirements, Pusch claimed that in fact, the modules were scrapped, without any of the purported HVAC installed equipment or other equipment salvaged, which further substantiates Plaintiff's belief that the modules were never constructed.

183.    Also substantiating Plaintiff's claim, the only video produced by Griffon Systems was in August of 2022 that was sixteen seconds of "the construction process," which merely shows a person moving a piece of material back and forth across the screen, as demonstrated by the screenshot below, that is not evidence of that The Locker System was actually constructed:



184.    To assure McCoy it did not have the capital repay the Deposit, on or about August 23, 2022, Griffon Systems provided Plaintiff with its profit and loss statement for Griffon Systems (the "P&L Statement") from September 2020 to March 2022—note the Deposit was paid to Griffon Holdings.

185. The P&L Statement not only demonstrated Griffon Systems could not repay the Deposit, but it also demonstrated it was undercapitalized to begin with and only relied on the Deposit delivered to Griffon Holdings to fund its efforts.

186. The P&L Statement also revealed that there were no other significant deposits or sales from other customers, as frequently represented by Griffon Systems.

187. On or about December 5, 2022, relying on the P&L Statement, Plaintiff entered into Settlement Agreement with Griffon Systems to release all claims against each other (the "Settlement Agreement"). A true and accurate copy of the Settlement Agreement is attached as Exhibit H.

188. In consideration for the mutual release under the Settlement Agreement, Griffon Systems was obligated to transfer to Plaintiff the Equipment specified in Exhibit A of the Settlement Agreement and an amount equal to $75,000 less shipping costs for the aforementioned equipment not to exceed $10,500 (the "Settlement Payment").

189. Under Section 4, of the Settlement Agreement, Plaintiff's release of claims against Griffon Systems under the Agreement was

> contingent upon delivery of the Equipment … and full and timely payment of the Settlement Payment…. In the event Griffon [Systems] fails to either (1) deliver the Equipment in its current condition; or (2) remit full and timely payment of the Settlement Payment, this release shall be null and void and Sustainable [Meats] shall have the ability to pursue Griffon [Systems] for breach of the Agreement and any other claims that are based on or arise out of or in connection with the Agreement, or arise out of the transactions or occurrences, or series of transactions or occurrences, that are the subject matter of any of the claims surrounding the Agreement.

**G. Griffon Systems Breached the Settlement Agreement.**

190. Griffon Systems supplied what they represented to be the Equipment promised in the Settlement Agreement, but all of the equipment that actually arrived was either irreparably

damaged (the two Generac generators arrived so damaged that they required more money to fix them than they were worth and were thus effectively a total loss), or, in the case of the two modules, they were built to such a low standard of quality that they could not be used for the purpose for which the Griffon Systems claimed they were intended.

191.    Further, Griffon Systems did not timely commenced payment performance under the Settlement Agreement.

192.    On or about April 12, 2023, Plaintiff informed Griffon Systems that it cancelled the Settlement Agreement and Griffon Systems is in breach of the Settlement Agreement that permits Plaintiff to sue for breach of the Agreement.

## H.  As a Result of Defendants' Actions, Plaintiff Lost Thousands of Customers and over One Million Dollars in Sales in Addition to Reputational Damage.

193.    As of January 1, 2021—the date by which Griffon Systems approximated the Locker System delivery—Plaintiff had over 10,000 active customers, most of whom were willing and able to buy meat.

194.    If The Locker System was operational by January 1, 2021 as promised, Plaintiffs would have exceeded One Million Dollars in sales for 2021 and 2022.

195.    However, because Plaintiff did not have a brick-and-mortar facility and it intended to rely on The Locker System, it produced no meat for nearly two years and continued to be sold out of meat due to not being able to slaughter any animals; therefore, it could not monetize those customer relationships because it had no way to generate raw meat products.

196.    Plaintiff constructed a new brick-and-mortar facility that opened in the second half of 2022, but it had lost most of its customers by then and has spent the last year rebuilding its customer base, unfortunately, with mostly new customers and not a high percentage of returning, lost customers.

197.    The revenue loss does not take into account the thousands of lost hours Plaintiff's team spent working with Defendants toward delivery of The Locker System, not to mention the reputational damage for not being able to deliver and serve its customer base.

## CONDITIONS PRECEDENT

198.    All preconditions to this action have been satisfied, waived, or occurred.

199.    Plaintiff has engaged the undersigned attorneys and is obligated to pay them a reasonable fee for their services.

### COUNT I
### Breach of Contract – Agreement & Settlement Agreement
### (Versus Griffon Systems, Griffon Holdings, and Griffon Farms)

200.    Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

201.    On or about October 9, 2020, Defendant Griffon Systems entered into a contract, the Agreement, with Plaintiff under which Griffon Systems, Griffon Holdings, and Griffon Farms, were obligated to fabricate, deliver, and install several food processing modules known as The Locker System in exchange for a total payment of $899,860.48 from Plaintiff with a deposit in the amount of $337,430.00 due at execution.

202.    Plaintiff fully performed under its contractual obligations and delivered the required payment of $337,430.00 on October 9, 2020 to Griffon Holdings.

203.    A few days prior, Defendant Griffon Holdings purchased the Farm, home to Griffon Farms, to fabricate The Locker System.

204.    Defendant Griffon Systems did not complete a single contractual obligation under the Agreement—it failed to deliver any portion of The Locker System and continually misrepresented its ability to perform and the status of its progress in fabricating The Locker

System—at one point claiming certain modules of The Locker System were ready to ship when in fact they were not constructed, or were so poorly constructed, they were unable to be shipped.

205.    Plaintiff notified Defendants Griffon Systems, Griffon Holdings, and Griffon Farms of their breach on January 26, 2022 via email and cancelled the contract on February 2, 2022.

206.    On or about February 2, 2022, Defendant Pusch admitted Defendants Griffon Systems, Griffon Holdings, and Griffon Farms could not deliver The Locker System as warranted and guaranteed Defendant Griffon Systems, Griffon Holdings, and Griffon Farms would refund the Deposit in "two tranches" over the course of 33 days.

207.    After four months of empty promises to return the Deposit—once claiming to be on the way to the bank to sign the loan papers to initiate the return—Defendants Griffon Systems, Griffon Holdings, and Griffon Farms failed to return any portion of the Deposit.

208.    By June of 2022, Defendant Griffon Systems, Griffon Holdings, and Griffon Farms acknowledged they did not have the capital to return the Deposit.

209.    Griffon Systems produced its P&L Statement to induce Plaintiff to settle the dispute.

210.    On or about December 5, 2022, Plaintiff and Defendant Griffon Systems entered into a Settlement Agreement for Plaintiff to release all claims under the Agreement on the condition Defendant Griffon Systems fully performed under the Settlement Agreement by transferring the Equipment and the Settlement Payment to Plaintiff, otherwise Plaintiff retained the ability to sue for breach under the Agreement rather than the Settlement Agreement.

211.    Defendant Griffon Systems breached the Settlement Agreement by 1) failing to provide the Equipment as warranted—the equipment arrived either irreparably damaged (the two

Generac generators arrived so damaged that they would require more money to fix than they were worth and were thus effectively a total loss) and the two Single Tall Modules were built to such a low standard of quality that they could not be used for the purpose for which the Defendant Griffon Systems claimed they were intended, including a discovery by Plaintiff after delivery that the modules were only insulated with approx. ½" of insulative foam between the steel siding, and therefore, unsuitable for USDA compliance and unsaleable to third parties—and 2) by failing to timely deliver any portion of the Settlement Payment.

212. On or about April 12, 2023, Plaintiff notified Defendant Griffon Systems it cancelled the Settlement Agreement, Defendant Griffon Systems was in breach of the Settlement Agreement, and it intends to file this Complaint.

213. As a direct and proximate result of Defendant Griffon Systems', Griffon Holdings', and Griffon Farms' breach of the Agreement, Plaintiff lost thousands of customers, over One Million Dollars in sales, and thousands of work hours dedicated to this fraudulent project not to mention Plaintiff suffered irreparable reputational damage.

214. As a direct and proximate result of these breaches, Plaintiff has been damaged in an amount to be determined at trial, based on, inter alia, the reasonable expectation of sales that Plaintiff would have made, lost work hours, and reputational damage had no breach occurred.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants Griffon Holdings, Griffon Systems, and Griffon Farms for their breaches of the Agreement, and for its actual and consequential damages arising from those breaches, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

<u>**COUNT II**</u>
**Breach of Contract – Consulting Agreement**
**(Versus Dirigo)**

215.    Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

216.    On or about October 9, 2020, Defendant Dirigo entered into a contract with Plaintiff, the Consulting Agreement, under which it was obligated to perform certain tasks and provide certain deliverables in exchange for fees accounted for in the total contract price of $899,860.48, half of which was due upon execution of all contracts.

217.    Plaintiff fully performed under its contractual obligations and delivered the required payment of $337,430.00 on October 9, 2020 and dedicated staff to train with Dirigo.

218.    Dirigo failed to perform the following tasks as required by Section (a) of the Consulting Agreement:

      a.  One weeklong onsite meeting to review facilities and process implementation at startup;

      b.  One weeklong onsite meeting to review facilities and process implementation at the occurrence of the FSA by USDA personnel;

      c.  Calls as needed with regulatory personnel; and

      d.  Emergency access to Pfannenstiel, not to exceed three hours a month.

219.    Additionally, Dirigo did not provide one deliverable as required in Section (b) of the Consulting Agreement, which resulted in Plaintiff needing to hire a USDA trained professional in November 2020 because Dirigo did not or was not capable of delivering these items.

220. Lastly, Defendant Dirigo abandoned the manufacturing efforts for The Locker System and left Plaintiff high and dry to fend for itself with Pfannenstiel's fabricator who was incapable of delivering The Locker System.

221. Less than three months into the twelve-month contract period, Pfannenstiel and Dirigo disappeared and no longer returned Plaintiff's emails or phone calls.

222. As a direct and proximate result of Defendant Dirigo's breach of the Consulting Agreement, Plaintiff lost thousands of customers, over One Million Dollars in sales, and thousands of work hours it dedicated to this effort in addition to reputational damage and the expense of hiring a replacement USDA professional to provide the services Defendant Dirigo was obligated to provide.

223. As a direct and proximate result of these breaches, Plaintiff has been damaged in an amount to be determined at trial, based on, inter alia, the reasonable expectation of sales, lost working hours, and expense to replace promised Defendant Dirigo's services.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant Dirigo for its breaches of the Consulting Agreement, and for its actual and consequential damages arising from those breaches, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

### COUNT III
### Fraudulent Inducement
### (in the alternative to Count I & II)
### (Versus Defendants)

224. Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

225. Defendant Pfannenstiel, as the President and CEO of Defendant Dirigo, falsely and fraudulently and with intent to defraud Plaintiff represented to Plaintiff that The Locker System:

    a.   would be manufactured under the quality control of Dirigo Food Safety;

    b.   is designed and manufactured for the carriage of general cargo by marine, road, and rail; and

    c.   could be lifted by its top corner castings by means of spreaders and by its bottom corner castings by means of casting at a sling angle of 30 degrees.

226.    Plaintiffs, prior to executing the contracts at issue, represented timing was of the essence and a material issue in deciding to execute the contracts because it needed to be operational by January 2021 to fulfill customers' orders.

227.    Defendant Posada, as the CEO and on behalf of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms falsely and fraudulently, and with intent to defraud Plaintiff, represented to Plaintiff that Defendants Griffon Systems, Griffon Holdings, and Griffon Farms were able and intended to complete the fabrication, delivery, and installation of The Locker System within a maximum of ten weeks, per Defendant Posada's email dated October 7, 2020.

228.    In the alternative, Defendant Posada, as the CEO and on behalf of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms, falsely and fraudulently and with intent to defraud Plaintiff Defendants Griffon Systems, Griffon Holdings, and Griffon Farms were able and intended to complete the fabrication, delivery, and installation of The Locker System in a period of twelve weeks from the date the Agreement was executed, per the Cover Letter to the Agreement dated October 7, 2020.

229.    Defendant Pfannenstiel, as the President and CEO of Defendant Dirigo, falsely and fraudulently and with intent to defraud Plaintiff represented to Plaintiff that her fabricator Defendants Griffon Systems, in connection with Defendants Griffon Holdings and Griffon Farms, was an experienced fabricator with contracts with FEMA and the DOD meaning they were able

and intended to complete the fabrication, delivery, and installation of The Locker System in a period of a twelve-week period from the date the Agreement was executed.

230.    Defendant Pfannenstiel, as the President and CEO of Defendant Dirigo, and members of Defendant Griffon Holdings went so far as to video conference with Plaintiff prior to represent the facility's alleged capabilities at the Farm to falsely and fraudulently and with intent to defraud represent to Plaintiff Defendant Griffons Systems alleged capabilities.

231.    Those representations were false, in fact, and known to be false by Defendants at the time they were made, and Defendants Griffon Systems, Griffon Holdings, and Griffon Farms' inability to fabricate, deliver, and install The Locker System in the more than two years following the execution date of the Agreement illustrates that Defendants could not and never intended to perform as represented and made these false representations to Plaintiff solely to defraud Plaintiff and lure it into entering the Agreement and transferring the $337,430 Deposit.

232.    Defendant Pfannenstiel, as the President and CEO of Defendant Dirigo, falsely and fraudulently and with intent to defraud Plaintiff represented to Plaintiff that Dirigo would oversee the manufacturing process and was a full-service food safety consulting group that specialized in HACCP and SQF compliance food safety training, crisis management, and scalable systems consulting services.

233.    Those representations were false in fact and known to be false by Defendants at the time they were made, and Defendants Dirigo and Pfannenstiel's inability to oversee and effectively manage the manufacturing of The Locker System was evident when Defendants Dirigo and Pfannenstiel did not interact with Defendants Griffon Systems, Griffon Holdings, Griffon Farms, Posada, and Pusch shortly after executing the Agreement and Consulting Agreement along with their silence and refusal to respond to any inquires less than three months into the twelve month

43

contracting period demonstrates they never intended to perform as represented and made these false representations to Plaintiff solely to defraud Plaintiff and lure it into entering the Agreement and Consulting Agreement and transferring the $337,430 Deposit.

234. Plaintiff justifiably relied upon those representations and was thereby induced to enter into the Agreement and Consulting Agreement suffering compensatory damages for said fraudulent inducement from Defendants for Plaintiff's actual, consequential, and punitive damages from Defendants for the wrongful and malicious acts of Defendants, and recovery from Defendants of Plaintiff's costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally liable, for their reliance of the stated falsehoods that resulted in its actual, consequential, and punitive damages, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

**COUNT IV**
**Fraud**
**(in the alternative to Counts I & II)**
**(Versus Defendants)**

235. Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

236. Defendant Pusch, as the COO and on behalf of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms falsely and fraudulently and with intent to defraud Plaintiff represented to Plaintiff the statements made in Paragraphs 76, 77, 80, 84, 85, 86, 88, 89, 90, 93, 95, 96, 101, 102, 103, 104, 106, 107, 108, 110, 112, 113, 114, 115, 116, 117, 119, 122, 125, 128, 130, 131, 134, 135, 136, 137, 138, 139, 141, 142, 143, 144, 145, 146, 148, 149, 150, 151, 152, 153, 155, 160, 164, 165, 166, 169, 170, 171, and 182 that Defendants Griffon Systems, Griffon Holdings, Posada, and Pusch were working to resolve issues related to and perform their obligation

with regards to the fabrication, delivery, and installation of The Locker System pursuant to the Agreement.

237.    Defendant Posada, as the COO and on behalf of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms falsely and fraudulently and with intent to defraud Plaintiff represented to Plaintiff the statements made in Paragraphs 171, 172, 173, 174, 175, 176, 177, and 178 that Defendants Griffon Systems, Griffon Holdings, Griffon Farms, Posada, and Pusch were working to resolve issues related to and perform their obligation with regards to the fabrication, delivery, and installation of The Locker System pursuant to the Agreement.

238.    Defendants Posada and Pusch representations were false in fact and known to be false as the they strung along Plaintiff for over two years following the execution date of the Agreement illustrating that Defendants were not and never intended to perform as represented and made these false representations to Plaintiff solely to defraud Plaintiff, prevent Plaintiff from terminating the Agreement, and to keep the Deposit to fund other business ventures.

239.    Defendant Pfannenstiel, as the CEO and on behalf of Defendant Dirigo, falsely and fraudulently and with intent to defraud Plaintiff represented to Plaintiff the statements made in Paragraphs  34, 35, 36, 37, 38, 39, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 59, and 73 that Defendants Griffon Systems, Griffon Holdings, and Griffon Farms were able and intended to complete the fabrication, delivery, and installation of The Locker System in the twelve weeks, that The Locker Systems would perform as advertised, and that Defendant Dirigo could and would provide certain deliverables, possessed certain qualifications, and would oversee the manufacturing of The Locker System.

240.    Defendant Pfannenstiel representations were false in fact and known to be false as demonstrated by Defendants Dirigo and Pfannenstiel lack luster performance and complete

abandonment of the project less than three months into the twelve month contract period thereby illustrating that Defendants Dirigo and Pfannenstiel were not and never intended to perform as represented and made these false representations to Plaintiff solely to defraud Plaintiff and to keep the Deposit to fund other business ventures.

241.    Plaintiff justifiably relied upon those representations and suffering compensatory damages for said fraud from Defendants in the sum of no less than $337,430.00 for Plaintiff's actual damages, exemplary or punitive damages from Defendants in the sum of no less than $674,860 for the wrongful and malicious acts of Defendants, and recovery from Defendants of Plaintiff's costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally liable, for their reliance of the stated falsehoods that resulted in its actual, consequential, and punitive damages, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

### COUNT V
### Unjust Enrichment
### (Versus Defendants)

242.    Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

243.    Plaintiff paid Defendants the Deposit equal to $337,430.00 in consideration for The Locker System and consulting services.

244.    Defendants have knowingly retained and enjoyed the benefit of the Deposit without delivering The Locker System or the consulting services to Plaintiff.

245.    Defendants have been unjustly enriched, at Plaintiff's expense and detriment, in the principal amount of $337,430.00 plus interest, the final amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants for its actual and consequential damages arising from their unjust enrichment, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

## COUNT VI
### Piercing the Corporate Veil – Alter Ego
### (Versus Defendants Posada and Pusch)

246.    Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

247.    Defendants Posada and Pusch are the controlling owners of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms and exercised such complete control over the corporation that the corporation had no separate mind, will, or existence of its own.

248.    Defendants Posada and Pusch have intermingled the assets of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms with their personal assets and assets of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms.

249.    Defendant Griffon Holding purchased the Farm for Defendant Griffon Systems to fabricate The Locker System and for Defendant Griffon Farms to operate the Farm.

250.    Defendant Posada's statements in that certain memorandum to Plaintiff dated June 26, 2022 that they are "illiquid," Defendants Posada and Pusch have caused Defendants Griffon Systems, Griffon Holdings, and Griffon Farms to be grossly inadequate in its capitalization given Griffon Systems', Griffon Holdings', and Griffon Farms' business in fabricating food processing equipment.

251.    Further, Plaintiff paid the Deposit to Griffon Holdings, but Griffon Systems executed the Agreement with Plaintiff and produced its P&L Statement to demonstrate it was illiquid and unable to return the Deposit.

252.     Plaintiff sustained injury and unjust loss as a result of the control exercised and the fraudulent and unlawful actions committed by Defendants Posada and Pusch.

253.     The corporate form of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms should be disregarded and Defendants Posada and Pusch should be held personally liable on Plaintiff's claims alleged against Defendants Griffon Systems, Griffon Holdings, and Griffon Farms above.

WHEREFORE, Plaintiff demands judgment in its favor and for this Court to disregard the corporate forms of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms and hold Defendants Posada and Pusch personally liable for the damages claimed in this Complaint, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

## COUNT VII
### Piercing the Corporate Veil – Fraud and Unjust Loss
### (Versus Defendants Posada and Pusch)

254.     Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

255.     Defendants Posada and Pusch are the controlling owners of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms and exercised such complete control over Defendants Griffon Systems, Griffon Holdings, and Griffon Farm that the corporations had no sperate mind, will, or existence of their own.

256.     Defendants Posada and Pusch exercised their control over Defendants Griffon Systems, Griffon Holdings, and Griffon Farms in such a manner as to commit fraud against Plaintiff as alleged in Counts III and IV.

257.     The corporate form of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms should be disregarded and Defendants Posada and Pusch should be held personally liable

on Plaintiff's claims alleged against Defendants Griffon Systems, Griffon Holdings, and Griffon Farms above.

258.    Plaintiff paid the $337,430 Deposit to a bank account controlled by Defendants Griffon Holdings and Posada to fund Griffon System's efforts to fabricate The Locker System on the Farm, and thus, the Deposit may no longer be held within the corporate forms of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms.

259.    Preventing Plaintiff from recovering the loss of the Deposit from Defendants Posada and Pusch personally would result in injury and unjust loss to Plaintiff.

WHEREFORE, Plaintiff demands judgment in its favor and for this Court to disregard the corporate forms of Defendants Griffon Systems, Griffon Holdings, and Griffon Farms and hold Defendants Posada and Pusch personally liable for the damages claimed in this Complaint, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

**COUNT VIII**
**Piercing the Corporate Veil – Fraud and Unjust Loss**
**(Versus Defendant Pfannenstiel)**

260.    Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-199 of this Complaint and further states as follows:

261.    Defendant Pfannenstiel exercised her control over Defendant Dirigo in such a manner as to commit fraud against Plaintiff as alleged in Counts III and IV.

262.    Plaintiff paid the Deposit to Griffon Holdings who subsequently paid Dirigo its consulting fee even though they did not perform.

263.    Plaintiff sustained injury and unjust loss as a result of the control exercised and the fraudulent and unlawful actions committed by Defendant Pfannenstiel.

264.    The corporate form of Defendant Dirigo should be disregarded and Defendant Pfannenstiel should be held personally liable on Plaintiff's claims alleged against Defendant Dirigo above.

WHEREFORE, Plaintiff demands judgment in its favor and for this Court to disregard the corporate forms of Defendant Dirigo and hold Defendant Pfannenstiel personally liable for the damages claimed in this Complaint, including any attorneys' fees and costs, and as all such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Sustainable Meats LLC demands a trial by jury on all issues so triable.


Respectfully submitted,

By: /s/ *Eleina K. Thomas*
Eleina K. Thomas (0091782)
Louis J. Licata (0007034)
GERTSBURG LICATA CO., LPA
600 East Granger Road, Suite 200
Cleveland, Ohio 44131
T: (216) 573-6000; F: (216) 920-9998
ethomas@gertsburglicata.com

*One of the Attorneys for Plaintiff Sustainable Meats LLC*